*Formatted for Electronic Distribution*                                                                                                    *For Publication*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

_____

**In re:**

    **ROME FAMILY CORPORATION,**                                              Chapter 7 Case
                           **Debtor.**                                              # 02-11771
_____

**NANAK RESORTS, INC.,**
                        **Plaintiff,**                    Filed & Entered
    **v.**                                                                     On Docket
                                           June 24, 2009                     Adversary Proceeding
**HASKINS GAS SERVICE, INC.,**                                                                    # 07-1010
                        **Defendant.**
_____

*Appearances:*    *James B. Anderson, Esq.*                   *Richard A. Lang, Jr., Esq.*
                             *Ryan, Smith & Carbine, Ltd.*            *Bauer, Gravel, Farnham,*
                             *Rutland, Vt.*                                   *Nuovo, Parker & Lang*
                             *For the Plaintiff*                         *Burlington, Vt.*
                                                                   *For the Defendant*

**MEMORANDUM OF DECISION**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

      At issue in this adversary proceeding is the ownership of a 30,000 gallon underground propane tank and related piping (the "System"): Was it owned by Rome Family Corporation (the "Debtor"), as of the date it filed for bankruptcy relief and then sold, pursuant to this Court's Order, to the Plaintiff Nanak Resorts, Inc.[1] ("Plaintiff" or "Nanak"), or did title to the System remain in Haskins Gas Service, Inc. ("Defendant" or "Haskins") pursuant to the specific terms of its contract with the Debtor? If the Court finds the System was part of the bankruptcy estate, the Defendant alleges notice and due process infirmities in the sale.

      This is the second time this adversary proceeding has come before the Court on dispositive motions. In the first decision, Nanak Hospitality, LLC v. Haskins Gas Service, Inc. (In re Rome Family Corp.), 2007 WL 4244697 (Bankr. D.Vt. Dec. 3, 2007), the Court denied the parties' cross-motions for judgment on the pleadings, observing that:

---

[1] Nanak Resorts, Inc. was substituted for Nanak Hospitality, LLC as the Plaintiff in this action (doc. # 89).

> a material fact, namely who owned the tank at the time the Debtor filed for bankruptcy relief, is in dispute. If, as the Plaintiff contends, the Debtor owned the tank as of the bankruptcy filing date, then the tank would have been part of the bankruptcy estate and sold pursuant to the Sale Order. On the other hand, if the Defendant owned the tank, then it would not have been part of the estate and could not have been conveyed in the Sale Order. Ascertaining that key fact is integral to the dispute.

Id. at * 5. Following discovery, Nanak filed its second motion for summary judgment (doc. # 81). Haskins opposed that motion and filed a cross-motion for summary judgment (doc. # 87). The parties also filed additional documents in support of their respective positions (docs. # 95, 96, 97, 101, 103, 105).

For the reasons set forth below, the Court grants Nanak's motion for summary judgment with respect to ownership of the System, and denies in part Haskins's cross-motion for summary judgment on that issue. However, the Court grants the Defendant's cross-motion to the extent the Defendant asserts a right to pursue relief based on equitable grounds.

### JURISDICTION

The Court has jurisdiction over this adversary proceeding and the pending motions pursuant to 28 U.S.C. § 157(b)(2)(K) & (N). Further, pursuant to this Court's May 2004 Order Authorizing Sale ("Sale Order") (case # 02-11771, doc. # 182), the Court specifically retained jurisdiction "for the purpose of enforcing the provisions of the Sale Order and resolving disputes." (See Sale Order attached as Ex. A. to doc. # 1, AP # 07-1010).

### BACKGROUND

In a roundabout way, the parties have agreed on what constitutes the undisputed material facts in this adversary proceeding. Nanak submitted a document entitled Plaintiff's Statement of Undisputed Facts (ex. to doc. # 81). In response, Haskins generally admitted those facts, but added qualifying language to a number of Nanak's factual paragraphs (ex. to doc. # 87). Nanak then conceded that "the Undisputed Facts are Plaintiff's Undisputed Facts 1-31 as qualified by Defendant's Response thereto, Vickie Haskins' October 10, 2007 Affidavit at ¶¶ 7-12 as sworn to by her February 12, 2008 deposition transcript, and Defendant's Answers to Plaintiff's Requests to Admit as sworn to by Peter Haskins in his May 21, 2008 deposition" (doc. # 96). The Court has used the parties' agreed-upon facts as the foundation for the undisputed material facts upon which it relies.[2]

I.    THE PARTIES' UNDISPUTED FACTS

1. On July 24, 2000 Haskins Gas Service, Inc. made Rome Family Corporation a written offer to: (a) sell and install a 30,000 gallon underground propane tank, piping and regulators at the Killington Campus located at 375 Killington Road, Killington, Vermont and (b) to use the System to supply propane gas to Rome's Killington Campus.

---

[2] See ex. to doc. # 81 and ex. to doc. # 87. The Court has omitted repetitive statements, statements making legal conclusions, or statements of facts that are not material to this dispute. Additional procedural history may be found in the earlier decision, In re Rome, 2007 WL 4244697 at *1-2.

2. Rome, through Bernard Rome, accepted Defendant's offer by (a) inviting Haskins to install the System at the Killington Campus, and (b) purchasing propane gas from Haskins using the System. The complete terms of the contract between Haskins and Rome consisted of a July 6, 2000 letter, the July 24, 2000 letter, and verbal agreements between Haskins and Rome that filled in and supplemented the letters (the "Contract").

3. Haskins completed installation of the System at the Killington Campus in November 2001 and began making propane deliveries at about that time.

4. There were some modifications to the Contract. Oral modifications were made pursuant to a conversation between Haskins and Bernard Rome that resulted in the following terms: (a) Rome Family Corporation would pay for the System at the termination of the Contract, (b) Haskins would reserve title to the System until the System was paid for, and (c) if Rome did not purchase the System, Haskins had the right to dig it up and repossess it. Additionally, as set out in the July 6, 2000 letter, if Haskins ceased to supply propane to the Killington Campus, it could sell the equipment and piping to the new supplier for the installed cost. Rome and Haskins were also in agreement that ownership of the System was to remain in Haskins so that: (d) the System could be removed; (e) Haskins could effectively monitor and control the System; and (f) Haskins could ensure that safety protocols were observed.

5. To have a customer pay for propane at the time of delivery and pay for the System at the end of the contract was standard in Haskins's regular course of business.

6. Haskins had no written document signed by Rome that acknowledged that Haskins: (a) owned the System; (b) had or reserved a security interest in the System; (c) reserved title to the System; or (d) had the right to enter Killington Campus at the termination or expiration of the Contract to remove the System.

7. Haskins received the Rome Family Corporation's notice of chapter 11 bankruptcy case[3] on or about December 16, 2002.

8. Haskins decided not to file a proof of claim because it had received repeated and consistent assurances by the Debtor that Haskins owned the System and that the System was not an asset of the bankruptcy estate. None of the documents Haskins received, including those associated with the sale, indicated that the Debtor owned the System or that the System would be sold at the sale.

9. On or about May 3, 2004, Haskins received and read a notice of sale that stated in substance that the Chapter 7 Trustee would sell all of the Rome Family Corporation bankruptcy estate assets at an auction to be held May 25, 2004.

---

[3] Rome initially filed under chapter 11 of the Bankruptcy Code in December 2002 (doc. # 1 in 02-11771); it converted to chapter 7 in March 2004 (doc. # 115).

3

10. Haskins understood that one of the properties that would be sold was the Killington Campus where they had installed the System, and that if Rome was not the high bidder, there would be a new owner of the Killington Campus. Haskins further understood that Rome would be obligated to pay for the System at the termination of the Contract, and if Rome failed to pay for the System, Haskins could go onto the Killington Campus and remove the System under its verbal agreement with Rome; alternatively, Haskins could sell the System to the purchaser's new propane supplier.

11. Haskins did not take any steps to demand payment for the System including, but not limited to, any of the following:

    (a) entering its appearance in the Rome Family Corporation bankruptcy case;

    (b) contacting the Chapter 7 Trustee to demand payment for the System;

    (c) notifying the Chapter 7 Trustee that Haskins claimed title to the System;

    (d) filing a proof of claim regarding its claim for payment or title to the System;

    (e) asking the Court to order the sales proceeds attributable to the System be paid to Haskins;

    (f) objecting to the Trustee's Sale Motion;

    (g) appealing the Court's May 25, 2004 Order authorizing the sale or its May 27, 2004 Order confirming the sale of the Killington Campus to Nanak; or

    (h) objecting to Trustee's final account and proposed distribution of estate assets.

12. Haskins did not take steps to perfect a security interest by filing a UCC-1 Financing Statement with the Vermont Secretary of State or the Killington Town Clerk at any time before the commencement of this case. Haskins asserts that its filing of a UCC-1 Financing Statement on about June 17, 2000, among other things, constituted notice of its claims to the System and put the Plaintiff and the Trustee on inquiry notice.

Nanak has offered no testimony, either via affidavit or deposition, to counter statements offered by Peter and Vicki Haskins, the President and Vice President, respectively, of Haskins Gas Service, Inc., or Bernard Rome, the former President of Rome Family Corporation, because the one person in a position to provide a different view of the facts surrounding the sale in relation to the System, based on first-hand knowledge on behalf of the Plaintiff – Gurdeep ("Sonny") Nagra, the principal of Nanak – refused to testify at a deposition.[4] See doc. # 67.

---

[4] Nanak's attorneys explained that Mr. Nagra had been the target of a "wide-ranging federal grand jury investigation involving [his] conduct while he was running Nanak Hotel Group and its associated enterprises," and had determined that, due to his "potential exposure to criminal prosecution on the basis of any testimony he may give in . . . bankruptcy court," he would "assert his 5th Amendment privilege against self-incrimination with respect to all of the topics you have identified for his deposition" (doc. # 67, Ex. B). The Court has issued an Order granting Haskins's motion to exclude Mr. Nagra's testimony at trial (doc. # 70). Haskins provided a transcript of the deposition of Dr. Verinder Malhotra, a partner of Mr. Nagra in Nanak. Dr. Malhotra offered financial help, but was not involved in Nanak's day-to-day operations of Nanak. (doc. # 87, Malhotra Dep. pp. 11-12). His testimony is not relevant to the issue of ownership of the System.

## II. ADDITIONAL UNDISPUTED FACTS

The Court bases its conclusions of law on some additional undisputed facts set out in the record which it regards as material to the dispute at issue, namely:

13. The Debtor did not list, and did not intend to list, the System on its schedules of assets (doc. # 87, Rome Dep., p. 30), and did not disclose on its statement of financial affairs (in response to a question asking for this type of information) that the System was property that the Debtor held for another (id. p. 58).

14. Vicki Haskins told Mr. Nagra, in October 2004, that Haskins owned the System, and Nagra responded that "he knew that. He said we wouldn't want to own it anyway" (doc. # 81, Haskins Dep., p. 6).

15. The Chittenden Bank had a commercial appraisal of the Killington campus performed by Mike Keller, who inspected the property after the sale, on June 4, 2004, and submitted his report on market value on June 18, 2004 (doc. # 87, Keller Dep. & Exs.). The appraisal referred to the System, but only in one place, where it noted:

> Reportedly, but not confirmed, utilities are in place for the build-out of the project's twelve buildings. Utilities include the aforestated water system, Alpine sewerage with 26 units, electricity and propane gas. <u>The propane gas system is owned by the supplier and the original contract was for ten years. At the end of the contract, the supplier has the right to sell the system to another provider or the property owner</u>.

(id., Ex. 9 to Keller Dep., pp. 16-17) (emphasis added). Mr. Keller testified that he did not do any independent investigation to determine whether the information he received concerning Haskins's ownership of the System was correct (id. Keller Dep. p. 37). Pressed as to whether the appraisal figure included the heating system, Mr. Keller stated, "It considers – it considers the contract situation for the supply of propane" (id. p. 38). Pressed further, he stated that the tank and system valuation did not appear as part of his appraisal. (Id.)

16. The Chapter 7 Trustee testified that, on the day of the sale, he presented the Court with "the information based on appraisals and everything else" (doc. # 81, Canney Dep., p. 17) – although a pre-sale appraisal is not included in the record. He also testified that he did not know who had supplied the propane heating system to the property (id., p. 15), but if there had been an agreement as to money owed, it should have been indicated under Schedule D if it was a secured claim, under Schedule F if it was an unsecured claim, or under Schedule G, if there was an executory contract (id., p. 34). The Chapter 7 Trustee testified that if he had known of a contract providing that Haskins owned the System, he would probably have informed Haskins that the bankruptcy estate was making a claim against the System (thereby giving Haskins notice of the estate's claim), and would have investigated the matter to determine whether Haskins's claim was perfected (id. pp.

5

35-36). The Trustee said that if he had determined Haskins had a valid claim, he would likely have litigated the extent of Haskins's interest (id. p. 39).

### III. SUMMARY JUDGMENT IS PROPER

The Court finds none of the facts that are material to the issue of ownership of the System are in dispute and the cross-motions for summary judgment on that issue are ripe for resolution.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. A genuine issue exists only when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 247. Factual disputes that are irrelevant or unnecessary are not material. See id. The court must view all the evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmovant's favor. See Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992). In making its determination, the court's sole function is to determine whether there is any material dispute of fact that requires a trial. See Anderson, 477 U.S. at 249; see also Palmieri v. Lynch, 392 F.3d 73, 82 (2d Cir. 2004); Delaware & Hudson Ry. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

### II. THE PERTINENT BANKRUPTCY STATUTES

Section 363, entitled "use, sale, or lease of property" provides in part that "[t]he trustee, after notice and a hearing, may. . . sell . . . other than in the ordinary course of business, property of the estate..." 11 U.S.C. § 363(b)(1). In the absence of controlling federal law, both "property" and "interests in property" are creatures of state law. See Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."). The issue presented in these cross-motions for summary judgment is whether the System constituted property of the estate when it was sold by the Trustee pursuant to the Sale Order. In other words, had ownership of the System shifted to the Debtor, by operation of state law, prior to when the Trustee sold the underlying real estate to Nanak, or did Haskins still own the System per the terms of the Haskins-Debtor contract? Accordingly, the Court looks to Vermont law, and specifically to statutes governing sales and title, to ascertain who owned the System at the time of the sale.

### III. THE PERTINENT VERMONT STATUTES

The Vermont provisions of the Uniform Commercial Code ("UCC") "appl[y] to transactions in goods." 9A V.S.A. § 2-102. Goods are defined as "all things (including specially manufactured goods)

6

which are movable at the time of identification[5] to the contract for sale other than the money in which price is to be paid. . ." 9A V.S.A. § 2-105(1). The Vermont statutes covering sales also provide that a contract is "limited to. . . the present or future sale of goods. 'Contract for sale' includes both a present sale of goods, and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (§ 2-401)." 9A V.S.A. 2-106(1).

Section 2-401, entitled "Passing of title; reservation for security; limited application of this section," provides that "[i]nsofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply":

> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (§ 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. <u>Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.</u> <u>Subject to these provisions</u> and to the provisions of the article on Secured Transactions (article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
>
> (2) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but (b) if the contract requires delivery at destination, title passes on tender there.
>
> (3) Unless otherwise explicitly agreed, where delivery is to be made without moving the goods, (a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

9A V.S.A. § 2-401(1), (2), (3) (emphasis added).

IV. THE PARTIES' ARGUMENTS

Nanak's argument is essentially legal, while Haskins's argument is essentially factual. The gravamen of Nanak's argument is that, notwithstanding the parties' intent, the verbal and written terms of the Contract, and the conduct of the Debtor and Haskins all showing that ownership (or title) of the System was to remain with Haskins, the provisions of 9A V.S.A. § 2-401 compel a determination that the

---

[5] Goods are identified pursuant to 9A V.S.A. § 2-501(1) as follows: "The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties." Whether the System was properly identified is not an issue in this case.

7

Debtor owned the System as of the date of the bankruptcy filing. Nanak asserts that, under § 2-401(2), title passed to the buyer (the Debtor) when the seller (Haskins) completed its performance by delivering the System to the Killington site in November 2001; under § 2-401(1), any reservation of title by Haskins in the delivered goods was limited to a reservation of a security interest; there is no document or testimony showing that the Debtor gave Haskins a security interest, or that Haskins perfected a security interest, in the System before the commencement of the bankruptcy case. Thus, Nanak concludes that the Debtor held unencumbered title to the System on the date the bankruptcy petition was filed, and title to the System passed to Nanak on the date of the Sale Order (doc. # 81, pp. 4-5). Nanak also argues that Haskins is precluded by the equitable principles of laches and waiver, and by res judicata in general, and the finality of the Sale Order under 11 U.S.C. § 363(m) in particular, from challenging its title to the System at this time (id., pp. 5-12).

Haskins responds that numerous questions of material fact are in dispute and that precludes the granting of summary judgment (doc. # 87, pp. 2-3). However, Haskins also asserts that the undisputed evidence of the written Contract between Haskins and Rome, supplemented by oral terms and trade usage, proves that Haskins owned the System on the date the bankruptcy case was filed and continued to own it through the date of sale; the Debtor never wanted title to the System and never took title to it; Nanak's principal agreed that Haskins owned the System; nothing in the bankruptcy schedules or Sale Order indicated that the System was an asset of the bankruptcy estate, and therefore it could not be sold pursuant to the Sale Order; and Haskins's rights were not impacted by the sale, and thus Haskins was not required to file any objection to the sale notice (id., pp. 4-7). Haskins also disputes that res judicata bars its right to assert a claim to the System. In response to Nanak's UCC arguments, Haskins asserts that since Rome and Haskins had an express agreement as to ownership and control of the System, 9A V.S.A. § 2-401(2) is not applicable; the Contract was actually in the nature of an entrustment or bailment and therefore the UCC provision that applies is 9A V.S.A. § 2-403; and Nanak is estopped from claiming that the System was an asset of the estate as that contradicts the Debtor's acknowledged assertions that the System was never its property (id., pp. 8-13). Haskins also insists that it never received any notice that the System was to be sold (id. pp. 12-13). Finally, Haskins argues that the present dispute should have been brought in Vermont state courts (id. pp. 14-15).

## V.  DETERMINATION OF THE SYSTEM'S OWNERSHIP

Although the parties have offered a number of different arguments in support of their respective positions, the Court finds one argument dispositive of the ownership issue: the applicability of the Vermont UCC statutes and, in particular, § 2-401(1).[6]

---

[6] Although Haskins has argued that there are a number of material facts in dispute and therefore the Court should deny a portion of Nanak's motion for summary judgment, two of the facts it cites (whether the Debtor paid anything toward the installed cost of the System and a discrepancy as to the estimated cost of the System) are not material. A third purported material fact was whether Vickie Haskins's testimony was credible; however, credibility is not an issue that can be determined

8

The parties do not dispute that Haskins and the Debtor entered into a Contract with both written and oral terms.[7] The Contract provided that Haskins would install the System and supply propane, and that the Debtor would pay the entire price of the System at the end of the Contract. (Statement of Facts [SOF] 4). The Vermont provisions of the UCC apply because the Contract was a contract for sale of goods, as both propane gas and the System, were "moveable at the time of identification to the contract for sale." 9A V.S.A. § 2-105(1). See, e.g., Adel v. Greensprings of Vermont, Inc., 363 F. Supp. 2d 692, 697 (D.Vt. 2005) (identifying water from a water supplier as a "good" under Article 2 of Vermont's UCC statute). It is also undisputed that Haskins and Mr. Rome explicitly agreed that: (i) the Debtor would purchase the System at the termination of the Contract; (ii) Haskins would reserve title to the System until it was paid for (SOF 4); and (iii) if the Debtor did not purchase the System, Haskins had the right to remove the System and repossess it (id.) (with the caveat that if the Debtor stopped purchasing propane from Haskins, Haskins would either trade tanks with the new supplier or have the new supplier buy the System from Haskins) (id.).

Section 2-401 applies in this adversary proceeding because title to the System is material, and this transaction is not covered by any other Vermont UCC provision. Haskins posits that its relationship with the Debtor is governed by § 2-403,[8] entitled "Power to transfer; good faith purchase of goods; 'entrusting.'" Section 2-403 provides, in part, that "[a] purchaser of goods acquires all title which his or her transferor had or had power to transfer. . . A person with voidable title has power to transfer a good title to a good faith purchaser for value." 9A V.S.A. § 2-403(1). It also provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." [9] § 2-403(2). By their plain terms, however, neither section 2-403(1) or (2), apply in this dispute.[10]

---

on summary judgment. A fourth fact – whether Mr. Rome informed the Chapter 7 Trustee that Haskins owned the System – is likewise not material to the legal question of whether § 2-401 applied to the transaction between Haskins and the Debtor.

[7] In the earlier Memorandum of Decision in this case, the Court opined that the text of the July 24, 2000 "Revised Proposal" from Peter Haskins to Mr. Rome was "only a proposal, not a contract." In re Rome Family Corp., 2007 WL 4244697 at * 5. Following that Decision, the parties engaged in discovery and have submitted evidence, and have agreed pursuant to the Undisputed Statement of Facts, that the two July 2000 letters from Haskins, supplemented by oral understandings, constituted the contract between the parties. The Court therefore modifies its prior decision and holds that Haskins and the Debtor did enter into a contract to supply propane and to purchase the System.

[8] Haskins's argument on this point is generally conclusory, as well as confusing (see doc. # 87 pp. 10-11). Section 2-403 would apply to the transaction between Haskins and Rome, not to the transaction between Rome and Nanak.

[9] "Entrusting" is defined as "any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law." § 2-403(3). Haskins seeks to apply the definition of "entrustment" disembodied from the context in which it applies in § 2-403(2). The contract at issue here did not involve Haskins "entrusting" the System to the Debtor; it involved Haskins selling the System to the Debtor.

[10] Haskins cites Purcell v. STN Enters., Inc. (In re STN Enters., Inc.), 47 B.R. 315 (Bankr. D.Vt. 1985), where Judge Marro interpreted an actual bailment agreement and stated, without any analysis, that "[u]nder the Uniform Commercial Code, as adopted in this State, title of goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties. 9A V.S.A. § 2-401(1)." Id. at 318. The STN case is inapposite since the contract between Haskins and the Debtor was not a bailment agreement.

9

Both parties contend that § 2-401(2) is applicable here. Nanak asserts that under this provision, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods despite any reservation of the security interest," and that under § 2-401(1), "any reservation by the seller of the title in good[s] shipped or delivered to the buyer is limited in effect to a reservation of a security interest" (doc. # 81, p. 4). On the other hand, Haskins contends that § 2-401(2) allows parties "to "make their own express agreement as to ownership and control" (doc. # 87, p. 8). These divergent views raise a question of statutory construction.

A.    Case Law Interpreting § 2-401

Vermont has no case law explaining how 9A V.S.A. § 2-401(1) and (2) should be interpreted. The Court therefore turns to bankruptcy cases in other states that have interpreted these UCC provisions, as § 2-401 in those states' statutes is effectively identical to 9A V.S.A. § 2-401. The holdings in those cases are uniform: pursuant to § 2-401, title passes to the buyer upon delivery of the goods, and the seller's interest is limited to a reservation of a security interest, notwithstanding any contractual agreement between the parties that the seller will retain title.

With regard to Haskins's contention that § 2-401(2) allows parties to explicitly agree when title to goods passes, all of the courts in the cases construing this provision, in which goods have been delivered, have rejected that interpretation of § 2-401(2). For example, in In re J. Adrian Sons, Inc., 205 B.R. 24 (Bankr. W.D.N.Y. 1997), Judge Kaplan methodically parsed the statute and found that the ownership rules of the statute supersede any agreement between the parties that the seller will retain title. Id. at 26. J. Adrian Sons involved a leasing company's request for relief from stay to regain possession of meat processing equipment in the debtor's possession, rather than the interpretation of a sale order, but Judge Kaplan's succinct analysis of how to read § 2-401(1), (2), and (3) is nonetheless instructive here:

> Although the question [of how to interpret the sentence in § 2-401 that limits a seller's reservation of title to a security interest and the next sentence that provides that subject to that limitation and Article 9 provisions, title passes in any manner agreed by the parties] is not free from doubt in light of the structure of § 2-401 and the paucity of case authority on this point, what authority there is is to the effect that § 2-401(1) "trumps" § 2-401(3). The principal authority is Connecticut Bank & Trust v. Schindelman (In re Bosson), 432 F. Supp. 1013 (D. Conn. 1977). The key language of § 2-401(3) is 'Unless otherwise explicitly agreed. . . .' The same language appears in § 2-401(2). In that context it was stated that § 2-401(1) 'places limits on the parties' contractual freedom. Specifically, § 2-401(1) negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to so do merely results in a security interest being retained.' Bosson, 432 F. Supp. at 1021 n.24; see also In re Gull Air, Inc., 73 B.R. 820 (Bankr. D.Mass. 1987).
>
> * * *
>
> Because § 2-401(1) deals with express agreements regarding passage of title as a general rule, § 2-401(2) and § 2-401(3) can only be viewed as dealing with certain common fact patterns in which the parties did not make express agreement regarding passage of title, and where, for example, the goods are being shipped, the goods are

10

in storage or are at their usual place of repose, or where (as here) the goods are already in possession of the buyer. The "Unless" clauses which introduce them demonstrate the drafters' intent that § 2-401(2) and (3) are "default" rules that apply in the absence of contrary agreement. <u>But any contrary agreement cannot conflict with § 2-401(1)</u>. The "Unless ..." clauses are to be read as if they said: "In the absence of *such* an agreement which explicitly provides to the contrary ...," in which event the "such" would refer to agreements contemplated by § 2-401(1), including its limitations. This writer has tinkered with the language and is convinced that there is no logical construction of § 2-401(2) or § 2-401(3) that would permit disobedience to § 2-401(1). Section 2-401(1) deals with agreements. Sections 2-401(2) and (3) deal with certain fact patterns in the absence of such an agreement. <u>The seller's only option is to perfect its security interest</u>, which [the Creditor] did not do.

<u>Id.</u> at 26-27 (emphasis added).

Since publication of <u>Adrian</u>, the cases that have construed these provisions have all adopted its court's interpretation. In <u>Malloy v. Brazeal (In re Callahan)</u>, 2007 WL 3018946 (Bankr. N.D. Okla. Oct. 11, 2007), the bankruptcy court further explained the interplay among the § 2-401 subsections this way:

Section 2-401 pronounces two immutable rules to which every sales agreement is subject. The first rule is that title cannot pass until goods are "identified to the contract." . . . The second rule is that once goods are in the possession of the buyer, any reservation of an interest or title by the seller is deemed a security interest. <u>Subject to those two rules</u>, the parties may otherwise determine by mutual agreement the point in the transaction that title will pass to the buyer. If the parties do not explicitly agree on a point in time (<u>i.e.</u>, the date of the contract, upon delivery, etc.), Sections 2-401(2) and (3) provide default rules for determining the transfer of title of goods. Specifically, if parties fail to explicitly agree on a time for passage of title and the goods are to be physically delivered by the seller to the buyer, title passes to the buyer upon physical delivery. <u>See</u> 12A O.S. § 2-401(2). If the agreement is silent regarding passage of title and the goods are already in the place where the buyer will take possession, Section 2-401(3) provides that title passes upon the delivery of a "document of title" if one is contemplated, or at the time of contracting, if no "documents of title" are involved. <u>See</u> 12A O.S. § 2-401(3).

<u>In no event, however, may title remain in the seller after the buyer takes possession of the goods</u> (or of a "document of title" to the goods, if applicable), <u>regardless of the parties' agreement or intent</u>. <u>See</u> <u>O'Dell v. Kunkel's, Inc.</u>, 1978 OK 29, 581 P.2d 878, 881 ("[d]evices whereby title is reserved in the seller-creditor for a period of time following possession by the debtor are treated under Article 9 of the U.C.C. as though title had been transferred to the debtor and the seller-creditor had retained only a security interest in the goods"); <u>Morton Booth Co. v. Tiara Furniture, Inc.</u>, 1977 OK 45, 564 P.2d 210, 212. See also, <u>Pro Page Partners, LLC v. Message Express Paging Co. (In re Pro Page Partners, LLC)</u>, 270 B.R. 221, 229-31 (Bankr. E.D.Tenn.2001) (contract for sale of personalty is not an executory contract if the seller has surrendered possession, even if the agreement provides for the retention of title pending completion of payments; the effect of such attempt to retain title was a reservation of a security interest); <u>In re J. Adrian Sons, Inc.</u>, 205 B.R. 24 (Bankr. W.D.N.Y. 1997); <u>Associated Indus. v. Keystone Gen'l, Inc. (In re Keystone Gen'l, Inc.)</u>, 135 B.R. 275, 279 (Bankr. S.D.Ohio 1991) ("if the seller attempts to retain title after delivery or until paid in full, all the seller gets is a security interest"); <u>Marlow v. Oakland Gin Co. (In re Julien Co.)</u>, 128 B.R. 987, 996 (Bankr. W.D.Tenn.1991) (while the parties could provide by contract when title to cotton would pass to the

11

buyer, "when such an agreement involves retention of documents of title after ship-ment or delivery, it is limited in effect to the granting of a security interest in favor of the seller"), aff'd on other grounds 44 F.3d 426 (6th Cir.1995); In re Gull Air, Inc., 73 B.R. 820, 824 (Bankr. D.Mass.1987); North Georgia Toyota v. Jahn (In re Tom Woods Used Cars, Inc.), 24 B.R. 529, 530 (Bankr .E.D.Tenn.1982). See also Stewart v. Barry County Livestock Auction, Inc. (In re Stewart), 274 B.R. 503, 510-11 (Bankr. W.D.Ark.) (bill of sale which transferred title that was voidable in the event payment was not made was ineffective pursuant to Section 2-401(1) because "any re-tention or reservation by the seller of title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest"), aff'd 282 B.R. 871 (B.A.P. 8th Cir.2002).

Id. at * 4-5 (emphasis added). Accord Wild West World L.L.C. v. Larson Int'l, Inc. (In re Wild West World, L.L.C.), 2008 WL 4642266 * 4 (Bankr. D.Kan. Oct. 17, 2008) ("Section 2-401(1) negates the ability to delay passage of title beyond delivery. Any express agreement of the parties or reservation of title in the seller is limited by § 2-401(1)"); Ivey v. Wilson (In re Payne), 2006 WL 3524442 * 5 (Bankr. M.D.N.C. Dec. 6, 2006) (adopting position of courts holding that title passed despite contracting parties' reservation of title, leaving seller only with a reservation of a security interest); Crouch Supply Co. v. Piknik Prods. Co., Inc. (In re Piknik Prods. Co., Inc), 346 B.R. 863, 866-67 (Bankr. M.D. Ala. 2006) (retention of title provision in sales agreement wherein seller purported to retain title to equipment in-stalled at buyer's plant until receipt of full payment was ineffective to prevent title from passing); Riddle Farm Equip., Inc. v. Boles (In re Boles), 2004 WL 3510119 * 2 (Bankr. M.D.N.C. Oct. 29, 2004) (even with explicit agreement that title was not to pass until financing was obtained or the purchase price paid, title nevertheless passed by operation of law when a tractor was delivered to the defendant, leaving the plaintiff, at most, only with a security interest); Skane, Inc. v. First Nat'l Bank of Omaha (In re Damrow Cattle Co., Inc.), 300 B.R. 479, 488-89 (Bankr. D. Neb. 2003) (corn was delivered to buyer pursuant to oral agreement; any reservation of rights by seller to the corn was a reservation of a security interest). A sister bankruptcy court succinctly described the temporal parameters for the shifting of title and the limitations on the parties' right to control title:

> The passage of title cannot occur before goods are identified to the contract, nor can the passage of title be delayed until after shipment or delivery of the goods to the buyer. After shipment or delivery, any retention of title by the seller results only in the reservation of a security interest. In between these extremes, the parties may freely specify the time at which title passes.

McCarthy v. Imported Cars of Maryland (In re Johnson), 230 B.R. 466, 468 (Bankr. D.D.C. 1999).

This Court adopts the interpretation of § 2-401(1) and (2) set out in these cases and will apply it to the Vermont statute. While the Court recognizes that this approach may punish a seller of goods who acted in good faith and who relied upon candid representations of the party with whom it was contracting, it is persuaded by the language of the statute and the overwhelming weight of authority that the UCC compels this result: upon delivery of the goods, title shifts to the buyer, by operation of law, under 9A

V.S.A. § 2-401(1) even when the parties have explicitly agreed that title will remain in the seller post-delivery.

### B. Application to This Adversary Proceeding

Having adopted the statutory interpretation of § 2-401 set out above, resolving the question of ownership of the System is straightforward. The undisputed facts show that Haskins and the Debtor orally and explicitly agreed that Haskins would "reserve title to the Propane System until the System was paid for." (SOF 4) However, apparently unbeknownst to either of them, and despite their clear agreement and intention that ownership of the System remained with Haskins, operation of law put ownership of the System in the Debtor on the date the System was delivered and installed (in November 2001). That left Haskins with only a reservation of a security interest, pursuant to § 2-401(1). The "unless otherwise explicitly agreed" language in § 2-401(2) invoked by Haskins does not change that result. Haskins had not perfected its security interest in the System as of the date of the Trustee sale.[11] Thus, under § 2-401(1), Haskins's ownership interest in the System had transferred to the Debtor well before the Trustee sold the Killington Campus to Nanak and Haskins had no perfected security interest as of the date of the sale.

Haskins argues that trade usage, based in part on safety issues, is a recognized part of any contractual bargain and supports its claim to ownership, and cites 9A V.S.A. § 1-201(3) as statutory authority for this position[12] (doc. # 87, p. 9). However, 9A V.S.A. § 1-205(2) defines usage of trade as

> any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

Id. Nothing in the Undisputed Statement of Facts addresses usage of trade, which must be proved as a fact. SOF 5 makes reference to Haskins's standard method of operation, but not to trade usage. In any event, trade usage would not be given effect if it violated the mandatory rules for determining ownership set out in § 2-401(1). See In re Wild West World, L.L.C., 2008 WL 4642266 at * 4 ("Moreover, § 2-401(1) cannot be varied by custom and usage in the trade, course of dealing, or agreement.").

Accordingly, Nanak's motion for summary judgment, to the extent that it seeks a declaration that it owned the System, free and clear of any lien or interest of Haskins, is granted and, on that issue,

---

[11] Haskins filed a UCC-1 Financing Statement on June 27, 2004 (approximately a month after the Trustee Sale), where it listed Rome Family Corp. as the "Debtor" (i.e., owner), listed itself as the secured party, and identified the collateral as a 30,000 gallon underground propane storage tank, one set of new storage tank accessories, one transport unloading station, one set of tank hold-downs, forty eight anodes, all underground gas piping, and all regulators – all equipment for propane system, located at 375 Killington Rd., Killington, VT (doc. # 1, ex. L). This document was ineffective in granting Haskins a security interest in the equipment because: (1) the Financing Statement had not been filed prior to the trustee sale, putting the world on notice of its interest; and (2) by operation of law, title in the system had passed in November 2001 when the System was delivered.

[12] 9A V.S.A. § 1-201(3) provides: "Agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title."

13

Haskins's Cross-Motion for Summary Judgment is denied. However, that does not dispose of all legal issues raised by the instant cross-motions.

### VI. ADDITIONAL ARGUMENTS AND CONSIDERATIONS

Haskins has raised a number of equitable arguments. One in particular deserves the Court's attention. Haskins contends that the notice of sale and sale orders did not provide clear, conspicuous, and accurate notice of <u>what</u> was being sold (as opposed to traditional notice/due process issues concerning whether all parties had been given adequate or proper notice <u>that</u> a sale would be taking place) (doc. # 87 p. 12). In essence, Haskins claims it was entitled to be alerted by both the Debtor and the Trustee that the Debtor owned the System, that it was included in the assets offered for sale and, in the absence of such notice, justice requires that the rights and duties of all parties to the transaction be adjusted accordingly. In this regard, Haskins points out that if the System had been owned by the Debtor from the time of delivery, then the Debtor had a duty to list the System in its schedules and disclose it on its statement of financial affairs, and the Trustee had a duty not only to identify it as an asset in the sale notice but also to ensure that the price paid was sufficient to compensate the estate for this specialized equipment.[13] Haskins accurately observes that these duties were not fulfilled. See <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610, 616 (9th Cir. 1988) ("The debtor has the clear responsibility of scheduling those assets that arguably belong to the estate. . . It is then up to the creditors to decide whether to challenge the debtor's position and up to the court to resolve any such challenge. The debtor . . .must be scrupulous in providing notice of all assets to which others may make a legitimate claim.") (citation omitted).

Haskins's notice/due process argument arises in a procedural thicket because: (a) up to and after the date of sale, all parties were operating under a mistaken belief that Haskins owned the System; (b) under state law, title to the System actually transferred to the Debtor upon delivery; (c) nothing in the record before the Court disclosed that the System was included in the property the Trustee sold; (d) the res of assets sold appears to have included the $90,000 System, even though no party to the transaction knew it at the time; (e) the determination of who held legal title to the System when the case was filed and when the Debtor's property was sold was not made until eight years after the System had been delivered, seven years after the Debtor had filed for bankruptcy relief, and five years after the sale; and (f) this decision is, in effect, retroactive. It is also noteworthy that if anyone had raised the issue of ownership, or alleged that the Debtor owned the System, at or prior to the hearing on approval of the sale, and hence that a "hidden

---

[13] The documents that one would have expected to provide this detail do not do so. For example, the various deposition transcripts reflect that both Haskins and the Debtor understood that Haskins rather than the Debtor owned the System and this is consistent with the Debtor not including the System as an asset in the Debtor's schedules and not disclosing it in the statement of financial affairs as an asset of Haskins's that the Debtor had in its possession. Moreover, the deed did not identify the personal property being sold and the post-sale appraisal – the only appraisal in the record – was unclear as to whether the System was included. Nothing in the Trustee's application to sell or notice of sale makes any reference to the System as either included in or excluded from the sale.

asset" in the form of a $90,000 heating system was also included in the sale, it is quite likely that this revelation would have triggered an inquiry by the Court as to the adequacy of the sale price.[14]

Now that the Court has determined that title in the System shifted to the Debtor upon delivery, Haskins's notice/due process arguments must be reframed to correspond to the relief available under these facts. There are only two ways to challenge a § 363 sale order. The first is by direct appeal, as referenced in § 363(m).[15] The Sale Order in this case was not appealed, and thus, as Nanak correctly points out, relief under § 363(m) is not available. The other way to challenge a § 363 sale order is via a motion to vacate the judgment under Rule 60(b), as incorporated in Fed. R. Bankr. P. 9024. This latter approach is not barred by res judicata. See Gekas v. Pipin (In the Matter of Met-L-Wood Corp.), 861 F.2d 1012, 1016 (7th Cir. 1988).

While relief pursuant to Rule 9024 and Rule 60(b) is an extraordinary remedy, in light of the unforeseen shift in ownership of the System, the failure of key parties to fulfill their statutory duties, the amount of time that elapsed between the sale and the determination of ownership, and the overall equities of this case, the Court will entertain an amended memorandum of law from Haskins and corresponding motion that frames Haskins's arguments for vacatur of the Sale Order in the context of Rule 60(b)(4) and (b)(6)[16] (and any other subsection of Rule 60(b) that Haskins believes to be applicable), and a responsive memorandum of law from Nanak. Then, the issue will be before the Court in a posture that would permit it to address the due process and equitable arguments related to notice raised by Haskins's cross-motion for summary judgment, and to determine whether Haskins has established a sufficient legal basis to invalidate the sale of the Killington parcel.[17] See, e.g., Polycel Structural Foam, Inc. v. Pool Builders

[14] At the hearing held to approve the sale, this Court rejected the Trustee's motion to approve Nanak's purchase of the Killington Campus, finding that the price it was offering was too low. In response to that ruling, Nanak increased it offer by a quarter of a million dollars. The Court found this price to be sufficient and confirmed the sale to Nanak for the higher price (doc. # 81, Canney dep. p. 17).

[15] Section 363(m) provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."

[16] Rule 60(b) (4) and (6) provide that "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . .(4) the judgment is void. . . (6) any other reason that justifies relief."

[17] A Rule 60(b) motion raises the possibility that sale of the Killington Campus parcel would be vacated (without vacating the sale of the other parcels sold pursuant to the Sale Order). If that occurred, Haskins, Nanak, and the estate would be returned to the status quo ante as it existed on the date of filing (but with full knowledge that the Debtor owned the System), and matters would proceed from there (concerning supplementing the Debtor's schedules to reflect that ownership; re-noticing of the sale, including notice to Haskins, the Trustee's right to bring an action to determine ownership of the System, etc.). The Court is also cognizant that it denied Haskins's Rule 60(b)(6) motion in its December 2007 decision, finding that it was unsupported based on the facts then before the Court. In re Rome Family Corp., 2007 WL 4244697 at * 8. In addition, the Court denied the Rule 60(b) motion on the alternate ground that it was untimely. Id. In the process of adjudicating the instant motions, the Court has had the benefit of new facts and arguments and has reconsidered the procedural history in this case. Furthermore, this decision, with its retroactive effect, creates an entirely new factual context for the legal arguments proffered by the parties. The Court finds that another Rule 60(b) motion would not be untimely. Rather than viewing the 2004 Sale Order as the starting point for counting the passage of time from which the Defendant moved for a declaration that it owned the System, the Court views the instant decision – which determines that the Debtor owned the System at the time of the sale and that the System was

Supply of the Carolinas, Inc. (In re Polycel Liquidation, Inc.), 2007 WL 77336 at * 6-9 (D.N.J. Jan. 8, 2007).

In sum, the Court finds that Haskins is entitled to its day in court to argue its rights and applicable remedies with respect to the sufficiency of the sale notice, in light of the factual and legal determinations made in this decision.

Haskins has argued quite persuasively that to strictly apply 9A V.S.A. § 2-401 with respect to ownership of propane tanks could create dire safety and/or liability issues in Vermont. While that is an important policy matter, it is one that the state legislature, rather than the courts, must address and, in any event, is not probative of the legal analysis governing the outcome in this case. Moreover, if the preferred practice among propane dealers is to retain some interest in propane systems that they install, the statute does not interfere with that in that it both permits sellers to retain a security interest and puts sellers on notice of their obligation to file a UCC-1 financing statement to perfect that interest.

The Court has considered the many other arguments raised by both the Plaintiff and the Defendant and, if not addressed herein, finds them to be without merit.

## CONCLUSION

For the reasons set forth above, on the issue of ownership of the System, the Plaintiff's Motion for Summary Judgment is granted and the Defendant's Cross-Motion for Summary Judgment is denied. On the question of whether the Defendant is entitled to litigate if there are due process and/or notice defects in the sale procedure that warrant setting aside the Trustee's sale of the Killington Campus, the Court will allow additional briefing. A briefing schedule on these Bankruptcy Rule 9024 / Federal Rule 60(b) issues is set out in the accompanying Order.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

June 24, 2009  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

---

conveyed by the sale – as the point at which the Rule 60(b) clock starts running, since it is this Order, rather than the Sale Order, that resolves whether the System was included in the sale.